## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LALIT KUMAR, Derivatively on Behalf of Nominal Defendant VENTURE GLOBAL, INC., | |
| Plaintiff, | Case No. 1:25-cv-05362 |
| v. | JURY TRIAL DEMANDED |
| MICHAEL SABEL, SARAH BLAKE, RODERICK CHRISTIE, SARI GRANAT, ANDREW OREKAR, ROBERT PENDER, THOMAS J. REID, JIMMY STATON, JONATHAN THAYER, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, and BofA SECURITIES, INC., | |
| Defendants, | |
| and | |
| VENTURE GLOBAL, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Lalit Kumar ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Venture Global, Inc. ("Venture" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and

announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Venture, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class actions captioned *Bowes v. Venture Global, Inc., et al.,* Case No. 1:25-cv-01364-JAV (S.D.N.Y.) (the "*Bowes* Action") and *FirstFire Global Opportunities Fund, LLC v. Venture Global, Inc.*, *et al.*, Case No. 1:25-cv-04642-JAV (S.D.N.Y.) (the "*FirstFire* Action") (collectively referred to herein as the "Securities Class Actions"), and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of Venture against certain of its officers and members of the Company's Board (the "Individual Defendants")[1] and Goldman Sachs & Co. LLC ("Goldman Sachs"), J.P. Morgan Securities ("J.P. Morgan"), LLC, and BofA Securities, Inc. ("BofA," and together with Goldman Sachs and J.P. Morgan, the "Underwriter Defendants") for breaches of their fiduciary duties from at least January 24, 2025, through March 6, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.      Venture is a long-term, low-cost provider of liquified natural gas ("LNG") sourced from North American natural gas basins. The Company's business includes assets across the LNG supply chain, including LNG production, natural gas transport, shipping and regasification.

3.      According to the Company's public filings with the SEC, the Company is in the process of commissioning, constructing, and developing five natural gas liquefaction and export

---

[1] The Individual Defendants are Michael Sabel ("Sabel"), Robert Pender ("Pender"), Jonathan Thayer ("Thayer"), Sarah Blake ("Blake"), Andrew Orekar ("Orekar"), Jimmy Staton ("Staton"), Thomas J. Reid ("Reid"), Sari Granat ("Granat"), and Roderick Christie ("Christie"). "Defendants" means Venture, the Individual Defendants, and the Underwriter Defendants, collectively.

projects near the United States Gulf Coast in Louisiana. The five projects are the Calcasieu Project, Plaquemines Project, CP2 Project, CP3 Project, and Delta Project.

4.     The Company went public via an initial public offering ("IPO") on January 24, 2025. Venture touted itself to investors during in its IPO Documents (defined herein) as having "reshaped the development and construction of liquefied natural gas production," establishing itself as "a rapidly growing company delivering critical LNG to the world." Additionally, the Company highlighted the Company's five natural gas liquification and export projects, touting the Company's unique "design one, build many" approach.

5.     On January 23, 2025, the Company issued a press release announcing the pricing for its IPO, stating, in relevant part:

> Venture Global, Inc. announced today the pricing of its initial public offering of 70,000,000 shares of its Class A common stock, par value $0.01 ("Class A common stock") at a public offering price of $25.00 per share. In connection with the offering, Venture Global has granted the underwriters a 30-day option to purchase up to an additional 10,500,000 shares of Class A common stock. The shares of Class A common stock are expected to begin trading on the New York Stock Exchange on January 24, 2025 under the symbol "VG".
>
> The closing of the offering is expected to occur on January 27, 2025, subject to the satisfaction of customary closing conditions.
>
> Goldman Sachs & Co. LLC, J.P. Morgan (each listed alphabetically) and BofA Securities are acting as joint lead book-running managers. ING, RBC Capital Markets, Scotiabank, Mizuho, Santander, SMBC Nikko, MUFG, BBVA, Loop Capital Markets, Natixis, Deutsche Bank Securities, Wells Fargo Securities and Truist Securities are acting as joint book-running managers for the offering. National Bank of Canada Financial Markets, Raymond James, Regions Securities LLC, Guggenheim Securities and Tuohy Brothers are acting as co-managers for the offering.

6.     The IPO closed on January 27, 2025, with the Company selling 70 million shares at $24.00 per share. Thereafter, Venture common stock began trading on the New York Stock Exchange ("NYSE") under the symbol "VG." On January 27, 2025, the Company filed a Form 8-

K with the SEC to announce the close of the IPO.

7.     Throughout the Relevant Period, the Individual Defendants made numerous materially false and misleading statements regarding the Company's business and operations, including that Venture's business strategy was financially sound and backed by sufficient customer demand, despite significant delays and cost estimate increases throughout its natural gas projects.

8.     However, the truth was revealed on March 6, 2025, when the Company issued a press release announcing its financial results for the fourth quarter and full year for 2024 (the "4Q24 Earnings Release"), wherein Venture revealed disappointing financial results, including lower-than-expected earnings per share ("EPS"). News outlets subsequently reported that Venture's EPS fell below market expectations, the Company was experiencing decreasing sales, and the cost estimates for the Plaquemines Project had increased.

9.     On this news, the Company's stock price fell $5.12 per share, or approximately 36%, to close at $9.08 per share on March 6, 2025.

10.     As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public.  Specifically, the Individual Defendants failed to disclose to investors that: (a) the Calcasieu Project's commissioning volumes had declined during the fourth quarter of 2024, and were continuing to decline, at levels substantially greater than the market's expectations and as purportedly warned in the IPO Documents; (b) the Calcasieu Project was experiencing continued production issues, which would result in further delays, reduced production volumes, and damage to the Company's customer relationships; (c) the Company was internally projecting reductions in production levels and income for 2025;  (d) the Plaquemines Project costs were substantially higher than the IPO

Document's estimate for the project ($23.3 billion-$23.8 billion); and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, financials, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

11.     As a result of the foregoing, the Securities Class Actions were filed against the Company and Defendants Sabel, Thayer, Pender, Blake, Granat, Orekar, Reid, Staton, Christie, Goldman Sachs, J.P. Morgan, and BofA in the United States District Court for the Southern District of New York.

12.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Actions, costs associated with responding to civil investigative demands from the federal government, as well as additional losses, including reputational harm and loss of goodwill.

13.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the Individual Defendants' liability in this derivative action and Defendants' liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Venture's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77k(f)(1)) and Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78u-4(f)).

15.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act and Securities Act.

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

18.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

19.    In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

20.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, and the Securities Class Actions are pending in this District.

# PARTIES

*Plaintiff*

21.     Plaintiff is, and has been at all relevant times, a continuous shareholder of Venture. Plaintiff is a citizen of Vermont.

*Nominal Defendant*

22.     Nominal Defendant Venture is a Delaware corporation with its principal executive offices located at 1001 19th Street North, Suite 1500, Arlington, Virginia 22209.   Venture's common stock trades on the NYSE under the ticker symbol "VG."

*Individual Defendants*

23.     Defendant Sabel is a co-founder of Venture and has served as Chief Executive Officer ("CEO") of the Company, a director of the Company, and as Executive Co-Chairman of the Board since September 2023. Sabel also serves as Chair of the Company's Compensation Committee and as Chair of the Company's Nominating and Corporate Governance Committee. According to the Company's proxy statement filed on a Schedule 14A with the SEC on April 3, 2025 (the "2025 Proxy"), Defendant Sabel received $36,285,182 in total compensation from the Company in 2024. Moreover, according to the 2025 Proxy, as of March 25, 2025, Sabel beneficially owned 1,968,604,458 shares of the Company's Class B Common stock through his position as Managing Partner at Venture Global Partners II, LLC, representing 97.8% of the Company's total voting power. Upon information and belief, Defendant Sabel is a citizen of the District of Columbia.

24.     Defendant Pender is a co-founder of Venture and has served as the Company's Executive Co-Chairman since September 2023. Pender also serves as a member of the Company's Compensation Committee and Nominating and Corporate Governance Committee. According to the 2025 Proxy, Defendant Pender received $28,531,384 in total compensation from the Company

in 2024. Upon information and belief, Defendant Pender is a citizen of Virginia.

25.     Defendant Thayer has served as Chief Financial Officer ("CFO") of the Company since January 2025. According to the 2025 Proxy Statement, Defendant Thayer received $6,333,949 in total compensation from the Company in 2024. Upon information and belief, Defendant Thayer is a citizen of Maryland.

26.     Defendant Blake has served as Chief Accounting Officer of the Company since January 2020. Upon information and belief, Defendant Blake is a citizen of Virginia.

27.     Defendant Orekar has served as a director of the Company since September 2023. Orekar also serves as Chair of the Company's Audit Committee. According to the 2025 Proxy, Defendant Orekar received $240,000 in total compensation from the Company in 2024. Upon information and belief, Defendant Orekar is a citizen of New York.

28.     Defendant Staton has served as a director of the Company since September 2023. Staton also serves as a member of the Company's Audit Committee. According to the 2025 Proxy, Staton received $240,000 in total compensation from the Company in 2024. Upon information and belief, Defendant Staton is a citizen of Kentucky.

29.     Defendant Reid has served as a director of the Company since September 2023. Reid also serves as a member of the Company's Compensation Committee. According to the 2025 Proxy, Reid received $240,000 in total compensation from the Company in 2024. Upon information and belief, Defendant Reid is a citizen of Pennsylvania.

30.     Defendant Granat has served as a director of the Company since September 2023. Granat also serves as a member of the Company's Nominating and Corporate Governance Committee. According to the 2025 Proxy, Defendant Granat received $240,000 in total compensation from the Company in 2024. Upon information and belief, Defendant Granat is a

citizen of New York.

31.    Defendant Christie has served as a director of the Company since September 2023. Christie also serves as a member of the Company's Audit Committee. According to the 2025 Proxy, Defendant Christie received $240,000 in total compensation from the Company in 2024. Upon information and belief, Defendant Christie is a citizen of Wisconsin.

***The Underwriter Defendants***

32.    Defendant Goldman Sachs served as an underwriter of the Company's IPO and helped to draft and disseminate the IPO Documents. Upon information and belief, Defendant Goldman Sachs is a citizen of New York.

33.    Defendant J.P. Morgan served as an underwriter of the Company's IPO and helped to draft and disseminate the IPO Documents. Upon information and belief, Defendant J.P. Morgan is a citizen of New York.

34.    Defendant BofA served as an underwriter of the Company's IPO and helped to draft and disseminate the IPO Documents. Upon information and belief, BofA is a citizen of New York.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

35.    By reason of their positions as officers and/or directors of Venture, and because of their ability to control the business and corporate affairs of Venture, the Individual Defendants owed Venture and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Venture in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Venture and its shareholders.

36.    Each director and officer of the Company owes to Venture and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in

the use and preservation of its property and assets and the highest obligation of fair dealing.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Venture, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.     To discharge their duties, the officers and directors of Venture were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

39.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Venture, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

40.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause

the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

41.     To discharge their duties, the officers and directors of Venture were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Venture were required to, among other things:

(i)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with all applicable federal, state, and local laws and regulations, and pursuant to Venture's own Code of Business Conduct and Ethics (the "Code of Conduct");

(ii)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)     Remain informed as to how Venture conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Venture and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Venture's operations would comply with all

applicable laws and Venture's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

42.     Each of the Individual Defendants further owed to Venture and the shareholders the duty of loyalty requiring that each favor Venture's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

43.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Venture and were at all times acting within the course and scope of such agency.

44.     Because of their advisory, executive, managerial, and directorial positions with Venture, each of the Individual Defendants had access to adverse, non-public information about the Company.

45.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Venture.

## VENTURE'S CODE OF CONDUCT

46.    The Company's Code of Conduct begins by stating, in relevant part, that:

The Company does not tolerate unethical or unlawful behavior. Our commitment to the highest level of ethical conduct should be reflected in all of the Company's business activities including, but not limited to, relationships with employees, customers, suppliers, competitors, the government, the public, and our stockholders. All of our employees, officers and directors must hold one another and themselves accountable to comply with the language and spirit of this Code and seek to avoid even the appearance of improper behavior.

One of our Company's most valuable assets is our reputation for integrity, professionalism and fairness. Our actions are the foundation of our reputation, and adhering to this Code and applicable law is imperative.

47.    Under the section titled, "Our Guiding Principles," the Code of Conduct states:

The Company is committed to becoming the world's leading producer of clean, low-cost liquefied natural gas. The following principles are reflected in this Code, shape our culture, and guide our relationships with our stockholders, business partners, employees, communities and other stakeholders.

- *Commitment to safety*: We continuously strive to protect the health and safety of our employees, contractors and customers, and the communities in which we operate.

- *Prioritizing integrity*: We hold ourselves to the highest standards of honesty and accountability.

- *Engaging with others responsibly*: We ensure that our communications and interactions with each other, our business partners and our regulators are respectful, free from conflict and comply with all applicable laws and regulations.

- *Embracing innovation*: We encourage the development of new ideas, collaboration, problem solving and ingenuity to support our continuing growth.

- *Purposeful focus:* Our business is underpinned by a purposeful focus that drives thoughtful and comprehensive analysis of issues that impact our stakeholders, leverages creativity, proactively addresses challenges and improves directed outcomes

48.    Under a section titled "Compliance with Laws, Rules, and Regulatory

Requirements," the Code of Conduct states:

> The Company's business and operations are subject to extensive regulation at the U.S. federal state and local levels, and in certain foreign jurisdictions, and compliance with all applicable laws and regulations is fundamental to the Company. We are strongly committed to conducting our business affairs with honesty and integrity and in full compliance with all applicable laws, rules and regulations. No employee, officer or director of the Company shall commit an illegal or unethical act, or instruct others to do so, for any reason, in the performance of their duties.

> Each employee, officer and director is responsible for understanding, respecting and complying with the laws, rules and regulations applicable to his or her duties at the Company, and is accountable for any violations thereof.

### 3.1 Federal and State Energy and Environmental Regulation

> We understand and comply with all laws and regulations, including our reporting obligations to our regulators, and cooperate with regulatory inquiries.

### 3.2 Trading on Inside Information

> Using non-public, Company information to trade in securities, or providing a family member, friend or any other person with a "tip", is illegal. All non-public, company information should be considered inside information and should never be used for personal gain. Our employees, officers and directors are required to familiarize themselves and comply with the Company's Statement of Policy Concerning Trading in Company Securities, copies of which are distributed to all employees, officers and directors and are available from the Legal Department.

### 3.3 Quality of Public Disclosures

> The Company has a responsibility to provide full and accurate information in our public disclosures, in all material respects, about the Company's financial condition and results of operations. Our reports and documents filed with or submitted to the Securities and Exchange Commission and our other public communications shall include full, fair, accurate, timely and understandable disclosure. The Company has established a Disclosure Committee consisting of senior management to assist in preparing and monitoring such disclosures.

49.     Under a section titled "Standards of Conduct," the Code of Conduct states, in

relevant part:

### 4.1 Conflicts of Interest

Our employees, officers and directors have an obligation to act in the best interests of the Company. All employees, officers and directors should endeavor to avoid situations that present a potential or actual conflict between their interest and the interest of the Company.

A "conflict of interest" occurs when a person's private interest interferes in any way, or even appears to interfere, with the interest of the Company, including its subsidiaries and affiliates. A conflict of interest may arise when an employee, officer or director takes an action or has an interest that may make it difficult for him or her to perform his or her work objectively and effectively. Conflicts of interest may also arise when an employee, officer or director (or his or her family members) receives improper personal benefits as a result of the employee's, officer's or director's position in the Company.

Situations that may constitute a conflict of interest include:

- Working, in any capacity, for a competitor, customer or supplier while employed by the Company.

- Accepting gifts of more than modest value or receiving personal discounts (if such discounts are not generally offered to the public) or other benefits as a result of your position in the Company from a competitor, customer or supplier.

- Competing with the Company for the purchase or sale of property, products, services or other interests.

- Having an interest in a transaction involving the Company, a competitor, a customer or supplier (other than as an employee, officer or director of the Company and not including routine investments in publicly traded companies).

- Directing business to a supplier owned or managed by, or which employs, a relative or friend.

Persons other than directors and executive officers who have questions about any material transaction or relationship that reasonably could be expected to give rise to such a conflict should discuss the matter with, and seek a determination and prior authorization or approval from, their supervisor, the Chief Compliance Officer or any designee of the Chief Compliance Officer. A supervisor may not authorize or approve conflict of interest matters or make determinations as to whether a problematic conflict of interest exists without first providing the Chief Compliance Officer or any designee of the Chief Compliance Officer with a written description of the activity and seeking the written approval of the Chief Compliance Officer or any designee of the Chief Compliance Officer. If the supervisor is himself or herself involved in the potential or actual conflict, the matter should instead be discussed

directly with the Chief Compliance Officer or any designee of the Chief Compliance Officer. Directors and executive officers should exclusively report any conflicts of interest to, or seek prior authorization or approval from, the Audit Committee of the Board.

## 4.2 Corporate Opportunities

Employees, officers and directors are prohibited from taking for themselves business opportunities that are discovered through the use of corporate property, information or position. No employee, officer or director may use corporate property, information or position for personal gain, and no employee, officer or director may compete with the Company. Competing with the Company may involve engaging in the same line of business as the Company, or any situation where the employee, officer or director takes away from the Company opportunities for sales or purchases of products, services or interests. . . .

## 4.5 Fair Dealing

Each employee, officer and director of the Company should endeavor to deal fairly with customers, suppliers, competitors, the public and one another at all times and in accordance with ethical business practices. No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice. No bribes, kickbacks or other similar payments in any form shall be made directly or indirectly to or for anyone for the purpose of obtaining or retaining business or obtaining any other favorable action. The Company and any employee, officer or director involved may be subject to disciplinary action as well as potential civil or criminal liability for violation of this Code.

Practices that are acceptable in a commercial business environment may be against the law or the policies governing U.S. federal, state, local, or foreign government employees. Therefore, no gifts or business entertainment of any kind may be offered or given to any government employee,
official, or regulator without the prior approval of the Legal Department.

Except in certain limited circumstances, the Foreign Corrupt Practices Act (**FCPA**) prohibits giving anything of value directly or indirectly to any "foreign official" for the purpose of obtaining or retaining business. When in doubt as to whether a contemplated payment or gift may violate the FCPA, contact the Legal Department before taking any action.

## VENTURE'S AUDIT COMMITTEE CHARTER

50.     Venture's Audit Committee Charter states that the purpose of the Audit Committee

is to assist the Board in its oversight of:

16

- the integrity of the Company's financial statements and internal controls;

- the qualifications, independence and performance of the Company's independent auditor;

- the design and implementation of the internal audit function;

- the Company's governance, policies, and processes for monitoring and mitigating risks;

- the review and approval of related party transactions required to be disclosed under Item 404 of Regulation S-K and the review and approval of policies and procedures pertaining to related-party transactions;

- the administration and oversight of the Company's compensation recovery policies; and

- the Company's compliance with legal and regulatory requirements.

51.    With respect to the Company's "Independent Auditor," the Audit Committee

Charter states that the Audit Committee has the following responsibilities:

- The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of any accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (subject, if applicable, to stockholder ratification). Each such accounting firm shall report directly to the Committee.

- The Committee shall pre-approve the audit services and non-audit services (including the fees and terms thereof) to be provided by the Company's independent auditor pursuant to pre-approval policies and procedures established by the Committee. The Committee may delegate its authority to pre-approve services to the Chair of the Committee or one or more Committee members, provided that such designees present any such approvals to the full Committee at the next Committee meeting.

- The Committee shall discuss with the independent auditor its responsibilities under generally accepted auditing standards, review and approve the planned scope and timing of the independent auditor's annual audit plan(s) and discuss significant findings from the audit and any problems or difficulties encountered, including any restrictions on the scope of the auditor's activities or on access to requested information, and any significant disagreements with management.

- The Committee shall evaluate the independent auditor's qualifications, performance and independence, and shall present its conclusions with respect to the independent auditor to the full Board on at least an annual basis. As part of such evaluation, at least annually, the Committee shall:

    - obtain and review a report or reports from the Company's independent auditor:

        - describing the independent auditor's internal quality-control procedures

        - describing any material issues raised by (i) the most recent internal quality-control review, peer review or Public Company Accounting Oversight Board ("PCAOB") review, of the independent auditing firm, or (ii) any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding one or more independent audits carried out by the auditing firm; and any steps taken to deal with any such issues;

        - describing all relationships between the independent auditor and the Company consistent with applicable requirements of the PCAOB regarding the independent auditor's communications with the audit committee concerning independence;

    - confirm and evaluate the rotation of the audit partners on the audit engagement team as required by law;

- The Committee shall establish policies for the Company's hiring of current or former employees of the independent auditor.

52.     With respect to the Company's "Internal Auditors," the Audit Committee Charter states that the Audit Committee has the following responsibilities:

The Committee shall review management's plans with respect to the responsibilities, budget and staffing of the internal audit function and its plans for the implementation of the internal audit function. The review shall include a discussion of those plans with the independent auditors.

53.     With respect to the Company's "Financial Statements; Disclosures and Other Risk Management and Compliance Matters," the Audit Committee Charter states that the Audit

Committee has the following responsibilities:

- The Committee shall meet to review and discuss with management and the independent auditor the annual audited financial statements and unaudited quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of the Company's Form 10-K or Form 10-Q with the SEC.

- The Committee shall review with management, personnel responsible for the design and implementation of the internal audit function and the independent auditor:

  - any analyses or other written communications prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative Generally Accepted Accounting Principles ("GAAP") methods on the financial statements;

  - the critical accounting policies and practices of the Company;

  - the effect of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the Company's financial statements; and

  - any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.

- The Committee, or the Chair of the Committee, shall review the type and presentation of information included in the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, paying particular attention to the use of non-GAAP financial information.

- The Committee shall, in conjunction with the Chief Executive Officer and Chief Financial Officer of the Company, review the Company's disclosure controls and procedures and internal control over financial reporting. The review of internal control over financial reporting shall include whether there are any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to affect the Company's ability to record, process, summarize and report financial information and any fraud involving management or other employees with a significant role in internal control

over financial reporting. The Committee shall also review any special audit steps adopted in light of material control deficiencies.

- The Committee shall review and discuss with the independent auditor any audit problems or difficulties and management's response thereto, including those matters required to be discussed with the Committee by the auditor pursuant to established auditing standards, as amended.

- In connection with its oversight responsibilities, the Committee shall be directly responsible for the resolution of disagreements between management and the auditor regarding the Company's financial reporting.

- The Committee shall review the Company's policies and practices with respect to risk assessment and risk management, including with respect to the oversight of risks from cybersecurity threat and discuss with management the Company's major financial and other risk exposures ("**Key Risks**") and the steps that have been taken to monitor and control such exposures.

- In furtherance of these purposes, the Committee will undertake those specific duties and responsibilities listed below and such other duties as the Board may from time to time prescribe; however, risk assessment and risk management are the responsibility of the Company's management. The Committee has an oversight role and, in fulfilling that role, it relies on the reviews and reports described below. The Committee may, as and to the extent it determines appropriate, review with management and take action with respect to:

  - setting the tone and developing a culture within the Company regarding Key Risks, promoting open risk discussion, and promoting integration of risk management into the Company's processes and goals;

  - the Company's risk identification, risk assessment, risk tolerance and risk mitigation and management practices for addressing Key Risks, and the guidelines, policies, procedures, processes and training for these undertakings;

  - management's implementation of the risk policies, procedures and training reviewed with the Committee;

  - reports and presentations provided by management regarding the effectiveness of management's undertakings with respect to the identification, assessment, mitigation, and management of Key Risks;

- the oversight and review of any management led investigations and/or the undertaking of any Committee or Board led investigations or review of advice and counsel received from third party advisors, which the Committee will have the power to engage in its reasonable discretion; and

- other matters as the Board determines relevant to the Committee's oversight of Key Risks assessment, mitigation, training and management.

- The Committee shall establish procedures for:

  - the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and

  - the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

- The Committee shall prepare the Committee report that the SEC rules require to be included in the Company's annual proxy statement.

54.    With respect to "Related Party Transactions," the Audit Committee Charter states

that the Audit Committee has the following responsibilities:

- The Committee will review and approve related party transactions required to be disclosed under Item 404 of Regulation S-K and review and approve policies and procedures pertaining to related-party transactions.

- The Committee shall review potential conflicts of interest involving directors, including whether such director or directors may vote on any issue as to which there may be a conflict.

55.    With respect to the Company's "Compensation Recovery Policies," the Audit

Committee Charter states that the Audit Committee has the following responsibilities:

The Committee will administer and oversee the Company's Financial Restatement Compensation Recoupment Policy and any other Company policies regarding the recoupment, repayment or forfeiture of compensation, including any such policies required to be adopted pursuant to applicable laws and regulations and SEC and NYSE rules and standards.

56.    With respect to "Reporting to the Board," the Audit Committee Charter states that

21

the Audit Committee has the following responsibilities:

- The Committee shall report to the Board periodically. This report shall include a review of any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the independence and performance of the Company's independent auditor, the Key Risks, the design and implementation of the internal audit function and any other matters that the Committee deems appropriate or is requested to include by the Board.

- At least annually, the Committee shall evaluate its own performance and report to the Board on such evaluation.

## SUBSTANTIVE ALLEGATIONS

### *Background*

57.     Venture is a long-term, low-cost provider of LNG sourced from North American natural gas basins. The Company's business includes assets across the LNG supply chain, including LNG production, natural gas transport, shipping and regasification.

58.     The Company is in the process of commissioning, constructing, and developing five natural gas liquefaction and export projects near the United States Gulf Coast in Louisiana. The five projects are the Calcasieu Project, Plaquemines Project, CP2 Project, CP3 Project, and Delta Project. The status of the projects as of December 31, 2024, are as follows:

| Project Name | Number of Trains | Expected Nameplate Capacity | Expected Excess Capacity | Expected Peak Production Capacity | Stage of Development |
|---|---|---|---|---|---|
| Calcasieu Project | 18 | 10.0 mtpa | 2.4 mtpa(1) | 12.4 mtpa(1) | Commissioning |
| Plaquemines Project | 36 | 20.0 mtpa | 7.2 mtpa(1) | 27.2 mtpa(1) | Construction and Commissioning |
| CP2 Project | 36 | 20.0 mtpa(2) | 8.0 mtpa(2) | 28.0 mtpa(2) | Engineering, Procuring Materials, and Manufacturing Modules |
| CP3 Project | 54 | 30.0 mtpa(2) | 12.0 mtpa(2) | 42.0 mtpa(2) | Development |
| Delta Project | 44 | 24.4 mtpa(2) | 9.8 mtpa(2) | 34.2 mtpa(2) | Development |

59.     The Calcasieu Project and the Plaquemines Project feature unique arrangements to liquify natural gas. As opposed to between two to three large scale liquefaction trains, the Calcasieu Project and the Plaquemines Project feature eighteen and thirty-six mid-scale liquefaction trains. The Company has stated that it plans to reuse this approach in subsequent projects.

60.     On March 1, 2022, the Company announced its first successful cargo loading and

departure from the Calcasieu Project, which had begun producing LNG in January 2022.[2]

61.    On December 26, 2024, the Company announced its first successful cargo loading and departure from the Plaquemines Project, approximately two and a half years after the Company's final investment decision for the project's first phase.[3]

62.    On January 23, 2025, the Company issued a press release announcing the pricing for its IPO, stating, in relevant part:

> Venture Global, Inc. announced today the pricing of its initial public offering of 70,000,000 shares of its Class A common stock, par value $0.01 ("Class A common stock") at a public offering price of $25.00 per share. In connection with the offering, Venture Global has granted the underwriters a 30-day option to purchase up to an additional 10,500,000 shares of Class A common stock. The shares of Class A common stock are expected to begin trading on the New York Stock Exchange on January 24, 2025 under the symbol "VG".

> The closing of the offering is expected to occur on January 27, 2025, subject to the satisfaction of customary closing conditions.

> Goldman Sachs & Co. LLC, J.P. Morgan (each listed alphabetically) and BofA Securities are acting as joint lead book-running managers. ING, RBC Capital Markets, Scotiabank, Mizuho, Santander, SMBC Nikko, MUFG, BBVA, Loop Capital Markets, Natixis, Deutsche Bank Securities, Wells Fargo Securities and Truist Securities are acting as joint book-running managers for the offering. National Bank of Canada Financial Markets, Raymond James, Regions Securities LLC, Guggenheim Securities and Tuohy Brothers are acting as co-managers for the offering.

63.    The IPO closed on January 27, 2025, with the Company selling 70 million shares at $24.00 per share. Thereafter, Venture common stock began trading on the New York Stock

---

[2] *See Venture Global LNG and Jera Announce Departure of Inaugural Commissioning Cargo from Calcasieu Pass*, Venture Global (Mar. 1, 2022), https://ventureglobal.com/2022/03/01/venture-global-lng-and-jera-announce-departure-of-inaugural-commissioning-cargo-from-calcasieu-pass/.

[3] *See First Cargo is Being Shipped On Venture Global's 'Bayou' Vessel to Germany*, Venture Global (Dec. 26, 2024), https://ventureglobal.com/2024/12/26/venture-global-announces-departure-of-inaugural-commissioning-cargo-from-plaquemines-lng/.

Exchange ("NYSE") under the symbol "VG." On January 27, 2025, the Company filed a Form 8-K with the SEC to announce the close of the IPO.

64.     Throughout the Relevant Period, the Individual Defendants made numerous materially false and misleading statements regarding the Company's business and operations, including that Venture's business strategy was financially sound and backed by sufficient customer demand, despite significant delays and cost estimate increases throughout its natural gas projects.

***Individual Defendants' Materially False and Misleading Statements***

65.     In connection with its IPO, on December 20, 2024, the Company filed a registration statement on a Form S-1 with the SEC. After filing one other amendment, on January 22, 2025, the Company filed the second amendment to the registration statement on a Form S-1/A with the SEC (the "IPO Registration Statement"). Subsequently, on January 24, 2025, Venture and the Underwriter Defendants assessed the IPO and filed the IPO's final prospectus on a Form 424B4 with the SEC, which was a part of the IPO Registration Statement (the "IPO Prospectus," and together with the "IPO Registration Statement," the "IPO Documents").

66.     The IPO Documents were reviewed, approved, and signed by Defendants Sabel, Blake, Christie, Granat, Orekar, Pender, Reid, Staton, and Thayer. Following the filing of the IPO Documents, Venture's IPO listed for sale 70 million shares of the Company's common stocks at an offering price of $25.00 per share.

67.     The IPO Documents touted Venture's overall business strategy, stating, in relevant part:

> Venture Global has fundamentally reshaped the development and construction of liquefied natural gas production, establishing us as a rapidly growing company delivering critical LNG to the world. Our innovative and disruptive approach, which is both scalable and repeatable, allows us to bring LNG to a global market years faster and at a lower cost. We believe supplying this clean, affordable fuel promotes global energy security and is essential to meeting growing global demand.

68.     Additionally, the IPO Documents highlighted the scale and implications of the

Company's LNG projects, stating, in relevant part:

> We are commissioning, constructing, and developing five natural gas liquefaction
> and export projects near the Gulf of Mexico in Louisiana, utilizing our unique
> "design one, build many" approach. Each project is designed or is being developed
> to include an LNG facility and associated pipeline systems that interconnect with
> several interstate and intrastate pipelines to enable the delivery of natural gas into
> the LNG facility. As illustrated by the chart below, our five current projects are
> being designed to deliver a total expected peak production capacity of 143.8 mtpa,
> which consists of an aggregate of 104.4 mtpa expected nameplate capacity and an
> aggregate of 39.4 mtpa of expected excess capacity. These amounts do not account
> for any potential bolt-on expansion liquefaction capacity. The expected nameplate
> capacity of our facilities measures the minimum operating performance thresholds
> guaranteed by the equipment providers, and the expected excess capacity represents
> the additional LNG that we aim to produce above such guaranteed amounts.
> Although COD has not yet occurred under the post-COD SPAs for any of our
> projects, we have been generating proceeds from the sale of commissioning cargos
> at the Calcasieu Project since the first quarter of 2022, and expect to do so at each
> of our other projects during commissioning prior to achieving COD for the relevant
> project or phase of a project.

| Project Name | Number of Trains | Expected Nameplate Capacity | Expected Excess Capacity | Expected Peak Production Capacity | Stage of Development |
|---|---|---|---|---|---|
| Calcasieu Project | 18 | 10.0 mtpa | 2.4 mtpa[1] | 12.4 mtpa[1] | Commissioning |
| Plaquemines Project | 36 | 20.0 mtpa | 7.2 mtpa[1] | 27.2 mtpa[1] | Construction and Commissioning |
| CP2 Project | 36 | 20.0 mtpa[2] | 8.0 mtpa[2] | 28.0 mtpa[2] | Engineering, Procuring Materials, and Manufacturing Modules |
| CP3 Project | 54 | 30.0 mtpa[3] | 12.0 mtpa[3] | 42.0 mtpa[3] | Development |
| Delta Project | 44 | 24.4 mtpa[3] | 9.8 mtpa[3] | 34.2 mtpa[3] | Development |

69.     Moreover, the IPO Documents highlighted the Company's model, including that

the Company makes sales of LNG during the development of its products, before they are

commercially operational, stating, in relevant part:

> By design, conventional, stick-built projects generally only engage in several
> months of commissioning production, thereby limiting the number of cargos
> produced before full commercial operations occur. Due to our unique modular
> development approach and configuration consisting of many mid-scale liquefaction
> trains, which are delivered and installed sequentially, it is necessary to commission
> and test our LNG facilities sequentially over a longer period of time than traditional
> LNG facilities with substantially fewer, larger-scale liquefaction trains. The

commissioning of the liquefaction trains at our facilities begins while portions of our facilities remain under construction.

This important reliability and technical requirement results in earlier production of LNG than with traditional LNG facilities. We believe this earlier production of LNG positions us to produce a substantial number of commissioning cargos for each of our LNG projects, generating proceeds that may be used to support any remaining construction work or fund subsequent projects and future growth. As an example of this, on March 1, 2022, we announced the successful loading and departure of our first cargo of LNG from the Calcasieu Project, just over two and a half years from our final investment decision for the project. By September 30, 2024, we had loaded and sold 342 LNG commissioning cargos and received approximately $19.6 billion in gross proceeds from such commissioning cargos.

70.     With respect to Venture's sales and purchase agreements for its LNG projects, the

IPO Documents stated:

The project companies for the Calcasieu Project, the Plaquemines Project and the CP2 Project have signed LNG sales and purchase agreements, or SPAs, to sell LNG based on a pre-determined pricing formula that commences after we achieve the commercial operations date, or COD, of the relevant project or phase thereof. Under each such post-COD SPA, COD does not occur unless the applicable project company has notified such customer that (i) all of the project's facilities have been completed and commissioned, including any ramp up period, and (ii) the project is capable of delivering LNG in sufficient quantities and necessary quality to perform all of its obligations under such post-COD SPA.

As of September 30, 2024, we have executed 39.25 mtpa of such post-COD SPAs with a well recognized set of third-party customers that we believe constitute one of the strongest portfolios of institutional LNG buyer credits in the world. Approximately 95% of our contracted post-COD SPAs – or 37.45 mtpa of such 39.25 mtpa – are 20-year fixed price agreements, providing a long-term stream of contracted cash flow. We have also executed 1.8 mtpa of post-COD SPAs on a short- and medium-term basis and we plan to continue to optimize our portfolio balancing profit, duration, and risk.

71.     The IPO Documents purportedly warned investors about the volatility of proceeds

derived from the commissioning of LNG sales, stating, in relevant part:

Historical proceeds from the sale of commissioning cargos at the Calcasieu Project, which has had an extended commissioning period due to unanticipated challenges with equipment reliability that we are in the process of remediating, may not be indicative of the duration of the commissioning period or the amount of proceeds for any future period or for any of our other projects. See "Business – Our

Liquefaction and Export Projects and Key, Complementary Assets – Calcasieu Project." Although we have included targeted COD dates for our projects and phases thereof, there can be no assurance that COD will not occur earlier or later than such targets. See "Business – Our Liquefaction and Export Projects and Key, Complementary Assets." If COD occurs earlier than expected for a particular project or phase thereof, it would adversely impact our ability to generate proceeds from the sale of commissioning cargos, which, subject to market conditions, may otherwise be more valuable than the revenues earned under our post-COD SPAs. . . .

As a result, we have experienced, and expect to continue to experience during the remainder of the commissioning phase, significant volatility in the proceeds we have generated from the sales of commissioning cargos from the Calcasieu Project. Since we began generating proceeds from the sale of commissioning cargos in the first quarter of 2022, our quarterly gross proceeds have fluctuated from a maximum of $2.9 billion ($2.4 billion in net proceeds, after deducting net cash paid for natural gas) for the three months ended March 31, 2023, to a minimum of $1.0 billion ($0.7 billion in net proceeds, after deducting net cash paid for natural gas) for the three months ended September 30, 2023. Accordingly, the proceeds we have generated from such sales of commissioning cargos of the Calcasieu Project to date may not be indicative of the duration of the commissioning period or the amount of proceeds from such sales for any future period for the Calcasieu Project or for any of our other projects. As a result, such proceeds, and also our operating results more generally, may vary significantly from one fiscal period to the next comparable fiscal period. Moreover, if we are not able to generate proceeds from the sale of commissioning cargos in the future that are comparable to such proceeds from the Calcasieu Project in the past, that could have a material adverse effect on our business, contracts, financial condition, operating results, cash flow, financing requirements, liquidity, prospects and the price of our Class A common stock.

72.     The IPO Documents also discussed the costs of completing the Plaquemines Project, stating, in relevant part, "[w]e currently estimate that the total project costs for the Plaquemines Project will be approximately $22.5 billion to $23.5 billion, including EPC contractor profit and contingency, owners' costs and financing costs, of which approximately $17.7 billion had been paid for as of September 30, 2024."

73.     The above statements contained in the IPO Documents were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors, *inter alia*,

that: (a) the Calcasieu Project's commissioning volumes had declined during the fourth quarter of 2024, and were continuing to decline, at levels substantially greater than the market's expectations and as purportedly warned in the IPO Documents; (b) the Calcasieu Project was experiencing continued production issues, which would result in further delays, reduced production volumes, and damage to the Company's customer relationships; (c) the Company was internally projecting reductions in production levels and income for 2025;  (d) the Plaquemines Project costs were substantially higher than the IPO Material's estimate for the project ($23.3 billion-$23.8 billion); and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, financials, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### The Truth is Revealed

74.    The truth began to emerge on February 5, 2025, when, *Retuers* published an article revealing that TotalEnergies CEO, Patrick Pouyanné, announced that he had been approached by Venture to see if his company would be interested in a long-term supply contract for LNG from the Calcasieu Pass terminal in Louisiana, but rejected the offer.[4] The article revealed that Pouyanné stated that: "I don't want to deal with these guys, because of what they are doing . . . . I don't want to be in the middle of a dispute with my friends, with Shell and BP." The article also revealed that Pouyanné rebuffed the offer "out of lack of trust" with respect to Venture. According to Pouyanné, "[t]he price of the LNG was so low[.] I said to my colleague, 'How is it possible to pay $1 less than the rest of the market? What is the trick?'" Pouyanné also revealed that TotalEnergies later

---

[4] America Hernandez & Curtis Williams, *Total CEO Says Company Rejected Venture Global as LNG Supplier Over Lack of Trust*, Reuters (Feb. 5, 2025), https://www.reuters.com/business/energy/total-ceo-says-company-rejected-venture-global-lng-supplier-over-lack-trust-2025-02-06/.

rejected the opportunity to take cargoes from the Company's Plaquemines project.

75.    On this news, the Company's stock price declined $2.20 per share, or approximately 12.5%, to close at $17.48 per share on February 6, 2025.

76.    Then, the truth was fully revealed on March 6, 2025, when the Company issued the 4Q24 Earnings Release and revealed its financial results for the fourth quarter and full year for 2024 to the public. The 4Q24 Earnings Release revealed disappointing financial results, reporting:

| | Three months ended December 31,(1) | | | | Twelve months ended December 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2024 | | 2023 | | 2024 | | 2023 | |
| REVENUE | $ | 1,524 | $ | 1,632 | $ | 4,972 | $ | 7,897 |
| OPERATING EXPENSE | | | | | | | | |
| Cost of sales (exclusive of depreciation and amortization shown separately below) | | 414 | | 489 | | 1,351 | | 1,684 |
| Operating and maintenance expense | | 211 | | 112 | | 589 | | 391 |
| General and administrative expense | | 88 | | 60 | | 312 | | 224 |
| Development expense | | 124 | | 165 | | 635 | | 490 |
| Depreciation and amortization | | 93 | | 69 | | 322 | | 277 |
| Insurance recoveries, net | | — | | — | | — | | (19) |
| Total operating expense | | 930 | | 895 | | 3,209 | | 3,047 |
| INCOME FROM OPERATIONS | | 594 | | 737 | | 1,763 | | 4,850 |
| OTHER INCOME (EXPENSE) | | | | | | | | |
| Interest income | | 57 | | 69 | | 244 | | 172 |
| Interest expense, net | | (117) | | (193) | | (584) | | (641) |
| Gain (loss) on interest rate swaps | | 704 | | (656) | | 774 | | 174 |
| Loss on financing transactions | | — | | (10) | | (14) | | (123) |
| Total other income (expense) | | 644 | | (790) | | 420 | | (418) |
| INCOME (LOSS) BEFORE INCOME TAX EXPENSE | | 1,238 | | (53) | | 2,183 | | 4,432 |
| Income tax expense (benefit) | | 248 | | (52) | | 437 | | 816 |
| NET INCOME (LOSS) | $ | 990 | $ | (1) | $ | 1,746 | $ | 3,616 |
| Less: Net income attributable to redeemable stock of subsidiary | | 37 | | 34 | | 144 | | 130 |
| Less: Net income attributable to non-controlling interests | | 15 | | 15 | | 59 | | 805 |
| Less: Dividends on VGLNG Series A Preferred Shares | | 67 | | — | | 68 | | — |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON STOCKHOLDERS | $ | 871 | $ | (50) | $ | 1,475 | $ | 2,681 |
| BASIC EARNINGS PER SHARE | | | | | | | | |
| Net income (loss) attributable to common stockholders per share—basic | $ | 0.37 | $ | (0.02) | $ | 0.63 | $ | 1.30 |
| Weighted average number of shares of common stock outstanding—basic | | 2,350 | | 2,350 | | 2,350 | | 2,070 |
| DILUTED EARNINGS PER SHARE | | | | | | | | |

| Net income (loss) attributable to common stockholders per share—diluted | $ | 0.33 | $ | (0.02) | $ | 0.57 | $ | 1.25 |
|---|---|---|---|---|---|---|---|---|
| Weighted average number of shares of common stock outstanding—diluted | | 2,610 | | 2,350 | | 2,585 | | 2,143 |

77.    Additionally, in the 4Q24 Earnings Release, the Company attributed the decrease in Consolidated Adjusted EBITDA as "primarily due to lower sales volumes of LNG and higher costs to remediate and commission the Calcasieu Project."

78.    Notably, following the Company's financial results, news reports observed that the Company's posted EPS missed the average analyst estimate of $0.76 per share on revenues of $1.92 billion, having only posted an earnings per share of $0.33 on revenue of $1.52 billion.[5] News reports further observed that Venture had substantially increased its cost estimates for the Plaquemines Project, that the Company's sales had unexpectedly fallen 6.7% year-over-year in the period, and that the Company reported a 6.6% decline in fourth quarter revenue.[6]

79.    On this news, the Company's stock price fell $5.12 per share, or approximately 36%, to close at $9.08 per share on March 6, 2025.

***Post-Relevant Period Events***

80.    Venture is still currently in the midst of legal actions from its major clients, including Shell and BP, on account of delays in the commissioning of the Company's projects and thus lack of LNG production.[7]

---

[5] *See e.g.,* Keith Noonan, *Why Venture Global Stock Plummeted Today*, The Motley Fool (Mar. 6, 2025), https://www.fool.com/investing/2025/03/06/why-venture-global-stock-plummeted-today/;

[6] *See e.g., id.*; *Venture Global Shares Slump on Downbeat Annual Core Profit Outloo*k, Reuters (Mar. 6, 2025), https://www.reuters.com/business/energy/lng-producer-venture-global-raises-plaquemines-project-cost-forecast-by-2-2025-03-06/.

[7] *See e.g.*, Robert Stewart, *Shell Hoping for Progress in US LNG Arbitration Case 'In the Coming Months,'* upstream (Mar. 26, 2025), https://www.upstreamonline.com/lng/shell-hoping-for-

*Harm to the Company*

81.     As a direct and proximate result of the Individual Defendants' misconduct, Venture has lost and expended, and will lose and expend, millions of dollars.

82.     Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Actions filed against the Company, the Individual Defendants, and the Underwriter Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

83.     Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

84.     Furthermore, the Securities Class Actions have exposed the Company to massive class-wide liability.

85.     Individual Defendants' misconduct has also exposed the Company to potential liability relating to civil investigative demands from the federal government.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

86.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

87.     Plaintiff will adequately and fairly represent the interests of Venture and its shareholders in enforcing and prosecuting its rights.

88.     Venture is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

---

progress-in-us-lng-arbitration-case-in-the-coming-months-/2-1-1797653?zephr_sso_ott=X9QyId.

89.    Plaintiff is a current shareholder of Venture and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein.  Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

90.    A pre-suit demand on the Board of Venture is futile and, therefore, excused.  At the time this action was commenced, the seven-person Board consisted of Individual Defendants Pender, Sabel, Orekar, Staton, Reid, Granat, and Christie (the "Director Defendants").  As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

91.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

92.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

93.    Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

94.     As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.  Specifically, as Board members of Venture, the Director Defendants knew, or should have known, the material facts surrounding Venture's financial condition and internal control mechanisms.

95.     Defendant Sabel is not disinterested or independent. Defendant Sabel is a co-founder of the Company and serves as CEO of the Company and as Executive Co-Chairman of the Board.  Moreover, as of March 25, 2025, Defendant Sabel beneficially owned 1,968,604,458 shares of the Company's Class B Common stock through his position as Managing Partner at Venture Global Partners II, LLC, representing 97.8% of the Company's total voting power. Furthermore, Defendant Sabel is also named as a defendant in the Securities Class Actions, and as such, faces a substantial likelihood of liability for the misconduct alleged therein. Thus, the Company admits that Defendant Sabel is a non-independent director.

96.     Defendant Pender is not disinterested or independent. Defendant Pender is a co-founder of the Company and serves as Co-Executive Chairman of the Board. Defendant Pender is also named as a defendant in the Securities Class Actions, and as such, faces a substantial likelihood of liability for the misconduct alleged therein. Thus, Defendant Pender is a non-independent director.

97.     Moreover, Defendants Sabel, Christie, Granat, Orekar, Pender, Reid, and Staton each reviewed, approved, and signed the IPO Documents. Accordingly, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

98.    Additionally, Defendants all of the Director Defendants are named as defendants in the Securities Class Actions. As such, each of the Director Defendants faces a substantial likelihood of liability for the misconduct alleged therein.

99.    Furthermore, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

100.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

101.    The Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

102.    The Director Defendants failed to take any action to sue the Underwriter Defendants for their wrongdoing detailed herein. Accordingly, by failing to take action against the Underwriter Defendants, the Director Defendants breached their fiduciary duties, are not disinterested, and demand upon them is futile, and thus excused.

103.    Additionally, the Director Defendants are not independent or disinterested in light of their longstanding business and personal relationships with each other and the Company. For instance, Defendants Sabel, Pender, Granat, Orekar, Reid, Staton, and Christie all serve in management positions at and/or on the board of directors of Venture Global LNG, Inc. ("VGLNG"), a wholly-owned subsidiary of Venture. Moreover, Defendants Sabel and Pender are

both Managing Partners of Venture Global Partners II, LLC ("VG Partners"), the controlling shareholder of the Company.

104.    Defendants Orekar, Staton, and Christie (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting.  At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above.  Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

105.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct.  The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct.  The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

106.    Accordingly, a pre-suit demand on the Board is futile and excused.

## COUNT I
### Against the Individual Defendants
### For Breach of Fiduciary Duty

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

109.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

110.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

111.    Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (a) the Calcasieu Project's commissioning volumes had declined during the fourth quarter of 2024, and were continuing to decline, at levels substantially greater than the market's expectations and as purportedly warned in the IPO Documents; (b) the Calcasieu Project

was experiencing continued production issues, which would result in further delays, reduced production volumes, and damage to the Company's customer relationships; (c) the Company was internally projecting reductions in production levels and income for 2025; (d) the Plaquemines Project costs were substantially higher than the IPO Material's estimate for the project ($23.3 billion-$23.8 billion); and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, financials, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

112.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

113.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

114.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

115.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Actions, exposing the Company to millions of dollars in potential class-

wide damages in the Securities Class Actions, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

116.    Plaintiff, on behalf of Venture, has no adequate remedy at law.

### COUNT II
**Against the Underwriter Defendants for Aiding and**
**Abetting Breach of Fiduciary Duty**

117.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.    Each of the Individual Defendants had fiduciary relationship with Venture and owed Venture fiduciary duties. As set forth above, the Individual Defendants breached its fiduciary duties to Venture.

119.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Underwriter Defendants have each encouraged, facilitated, and advanced the Individual Defendants breaches of their fiduciary duties.

120.    Specifically, the Underwriter Defendants knowingly participated in the Individual Defendants breach of fiduciary duties by permitting and/or causing the Individual Defendants to issue the materially false and misleading statements to the public set forth above, including in the IPO Documents filed by the Company with the SEC.

121.    As a result, the Underwriter Defendants have each aided and abetted, conspired, and schemed with the Individual Defendants to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

122.    Plaintiff on behalf of Venture has no adequate remedy at law

### COUNT III
**Against the Individual Defendants for Unjust Enrichment**

123.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

124.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Venture.

125.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Venture that was tied to the performance or artificially inflated valuation of Venture, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

126.    Plaintiff, as a shareholder and a representative of Venture, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

127.    Plaintiff on behalf of Venture has no adequate remedy at law.

## <u>COUNT IV</u>
### Against the Individual Defendants for Waste of Corporate Assets

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

130.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

131.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

132.    Plaintiff, on behalf Venture, has no adequate remedy at law.

## COUNT V
**Against the Individual Defendants and the Underwriter Defendants for Contribution Under Section 11(f) of the Securities Act and Section 21D of the Exchange Act**

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.    As a result of the misconduct alleged above, the Company is a defendant in the Securities Class Actions, in which it is a joint tortfeasor in claims brought under Sections 11, 12(a)(2), and 15 of the Securities Act.

135.    Federal law provides Venture with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

136.    The plaintiffs in the Securities Class Actions allege that the IPO Documents, filed with the SEC in connection with its IPO, contained numerous untrue statements of material facts and omitted to state material facts necessary to make the statements not misleading.

137.    Venture is the registrant for the IPO, and the Individual Defendants and Underwriter Defendants named herein were responsible for the contents and dissemination of the IPO Documents.

138.    As the issuer of the shares, Venture is strictly liable to the plaintiffs in the Securities Class Actions for the misstatements and omissions alleged therein.

139.    The plaintiffs in the Securities Class Actions allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Documents were true and not misleading.

140.    The Individual Defendants, because of their positions of control and authority as officers and directors of Venture, and the Underwriter Defendants, because of their positions of control and authority as underwriters of Venture's IPO, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Venture, including the wrongful acts complained of herein and in the Securities Class Actions.

141.    Accordingly, the Individual Defendants and the Underwriter Defendants are liable pursuant to Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)), which creates a private right of action for contribution, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

142.    As such, Venture is entitled to receive all appropriate contribution or indemnification from the Individual Defendants and the Underwriter Defendants.

143.    Plaintiff, on behalf Venture, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys'

fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

DATED: June 27, 2025                    **RIGRODSKY LAW, P.A.**

                                By:   */s/ Timothy J. MacFall*
                                      Seth D. Rigrodsky
                                      Timothy J. MacFall
                                      Vincent A. Licata
                                      Leah B. Wihtelin
                                      825 East Gate Boulevard, Suite 300
                                      Garden City, NY 11530
                                      Telephone: (516) 683-3516
                                      Email: sdr@rl-legal.com
                                      Email: tjm@rl-legal.com
                                      Email: vl@rl-legal.com
                                      Email: lw@rl-legal.com

                                      *Attorneys for Plaintiff*


**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com